J-A01027-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: T.L.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1366 EDA 2020 |

Appeal from the Decree Entered June 17, 2020
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s):  No. 2019-A0186

BEFORE:   BENDER, P.J.E., OLSON, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED MARCH 23, 2021**

Appellant J.B. ("Father"), appeals the decree dated June 15, 2020, and entered on June 17, 2020, granting the Montgomery County Office of Children and Youth's ("OCY's" or "Agency's") petition to involuntarily terminate his parental rights to his dependent, minor, female child, T.L.K., ("Child") (born in January 2018), under the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (8), and (b).[1]  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Child's mother, N.L.K., ("Mother"), voluntarily relinquished her parental rights on February 4, 2020.  **See** Trial Court Opinion, 6/15/20, at 1.  As part of the current matter, the trial court changed Child's permanency goal to adoption under the Juvenile Act, 42 Pa.C.S. § 6351, in a separate order, dated June 15, 2020, which was not entered on the Orphans' Court docket, and which Father did not appeal.  **See** Trial Court Opinion, 6/15/20, at 1, 23.  **Cf. Commonwealth v. Walker**, 185 A.3d 969, 971 (Pa. 2018) ("[W]here a single order resolves issues arising on more than one docket, separate notices of

The trial court set forth the factual and procedural history of this appeal, as well as its findings of fact, which we find supported by competent testimony and documentary evidence admitted at the hearings, and adopt herein. *See* Trial Court Opinion, 6/15/20, at 1-17.

On April 10, 2018, the trial court, Judge Wendy Demchick-Alloy, adjudicated Child dependent pursuant to 42 Pa.C.S. § 6302(1). On October 7, 2019, OCY filed the termination petition. The trial court held a series of permanency review hearings, including one on January 23, 2020, which the trial court incorporated into the record in the termination matter. At the January 23, 2020 hearing, Attorney Mary Coyne Pugh served as GAL/Counsel for Child. OCY presented the testimony of its caseworker, Amber McCarthy. N.T., 1/23/20, at 8. Father presented a number of witnesses on his behalf.

On February 4, 5, and 24, 2020, the trial court held evidentiary hearings on the termination petition, with Judge Lois Murphy presiding. The trial court incorporated the record from the dependency proceedings, and also considered the petition to change Child's permanency goal to adoption which had been filed in Juvenile Court. At the hearing on February 4, 2020, after

_____

appeal must be filed for each case"); *Commonwealth v. Johnson*, 236 A.3d 1141, 1148 (Pa. Super. 2020) (*en banc*) (stating that, although each notice of appeal contained multiple docket numbers, it was "of no consequence," because the defendant complied with *Walker* by filing a separate notice at each docket number). Here, Father appealed only the termination decree, and did not appeal the goal change order.

Mother voluntarily relinquished her parental rights, OCY presented the testimony of Amee Mickhael, a trauma therapist at Children's Crisis Treatment Center, N.T., 2/4/20, at 15; Michael Sloan, a police officer employed by Hatfield Township, *id.* at 33; and Father, *id.* at 41. Finally, OCY presented the testimony of Elizabeth Matthews, an OCY senior caseworker and intensive services specialist, *id.* at 81-82; and Amber McCarthy, an OCY caseworker, *id.* at 162. Father, represented by counsel, testified on his own behalf.

At the hearing on February 5, 2020, Father presented the testimony of Desiree Purdy, supervisor at Justiceworks Youth Care. N.T., 2/5/20, at 6. The GAL/Counsel presented the testimony of A.D., Child's foster mother. *Id.* at 23.

At the hearing on February 24, 2020, OCY presented the expert testimony of Stephen Miksic, Ph.D., in the areas of general psychology, parenting capacity, and bonding. N.T., 2/24/20, at 4. Father presented the testimony of Donald G. Seraydarian, Ph.D., a psychologist who performed a psychological forensic evaluation of Father, and responded to questions concerning Father's ability to parent, his personality disorders, and his history of substance abuse. *Id.* at 78.

Based on the testimony and exhibits admitted at the hearings, the trial court adeptly set forth the factual background and procedural history of this appeal, as follows.

[Child] was born [in January 2018] and is now two-and-a-half years old. She had been exposed to illegal drugs in utero and was hospitalized in the NICU [neonatal intensive care unit] for a period of approximately one month. OCY was involved in supervising the care of [Child] after her discharge from the hospital to her birth mother's care. Thereafter, [Child] was removed from her birth mother's care by order of the Juvenile Division of the Court of Common Pleas of Montgomery County at approximately three months of age.

[Father] was incarcerated for approximately two years from May[,] 2017 until his release on parole in May, 2019. [Father] was incarcerated at the time of [Child's] birth and at [the] time that she was removed from the birth mother's home. Due to his incarceration at that time, [Father] could not himself provide a home for [Child]. He participated in the hearings before the Juvenile [C]ourt while he was incarcerated, either by video or in person.

In May 2019, when he was released from prison, he began to live with his father and his father's fiancée, with whom he still lives today. He sought and found seasonal employment. He requested visits with [Child]. At the time of trial, visits with [Father and Child] were supervised visits in the community, twice each week for two hours each visit for a total [of] four hours per week. However, when the Courthouse and County of Montgomery declared an emergency due to the COVID-19[,] the OCY suspended all supervised visits for the period beginning approximately March 16, 2020.

[Father] has a history of serious drug use, including a conviction for possession of a controlled substance, methamphetamines, while in prison. He admitted to a history of use of marijuana, heroin and methamphetamines, and to an arrest record that began when he was 15 years old for stealing from cars. He was subsequently arrested a number of times for theft as well as possession of marijuana. He has repeatedly been placed on parole or probation, and he admitted that he has never completed a term of supervision without being found to have violated the terms of his supervision. N.T. 2/4/2020 p. 50. Following his release in May 2019, he has been on parole. Sobriety is a condition of his parole and he is drug[-]tested by his parole officer and also participates in drug and alcohol counseling. On August 17, 2019 he was arrested at approximately 2:30 a.m. for driving

under the influence. The arresting officer described that he observed the car to cross the yellow line and to make an extremely wide turn, and then he stopped the car.

When he had stopped [Father's] car[,] the officer could smell alcohol[;] [Father's] eyes were bloodshot and watery. [The officer] administered field sobriety tests to [Father] and determined that [Father] had been driving under the influence. [Father] was arrested[,] and that criminal change was still pending at the time of these hearings. [Father's] supervision was increased as a result of that arrest[,] and he wears an ankle monitor. N.T. 2/4/2020, p. 50. He admitted to drinking on three occasions since his release from prison in May 2019. *Id.*

[Father] testified that he used marijuana and alcohol from age 13, began using Percocet at age 18-19, heroin at age 20-21, and methamphetamines at age 24. From [age] 13 until 2019, Father had never participated in any inpatient drug rehabilitation program. N.T. 2/4/2020, p. 50-51. However, starting in 2014, as a condition of his adult probation or parole, he was required to attend outpatient drug and alcohol treatment. He testified that he has never been charged with nor convicted of any violent crimes. He testified that, since his release from prison in May 2019, he now participates in a drug treatment program at Penn Foundation. Initially he saw his drug counselor weekly, but[,] in July 2019, his visits were reduced to bi-weekly. He stated that he and his drug counselor concluded in December that he was not at risk for a relapse with drugs or alcohol. N.T. 2/4/2020 p. 53, p. 68. [Father] testified that he has not used heroin for 4 years and has not used meth for 3 years. N.T. 2/4/2020 p. 53. He testified that he goes to [Alcohol Anonymous] meetings two to three times per week. N.T. 2/4/2020 p. 66.

[Father] testified that, since he was released from prison in May 2019, he has been employed. From May 17, 2019 through September 2019 he worked at a construction company []. Beginning on September 23, 2019 he has been employed by a paving company [].

When [Father] was testifying in February, he explained that he was laid off for the winter months at that time. Although he reported to OCY that he also had attained a job at [a "fast food" restaurant], he testified that he only worked at [the restaurant]

for one day and then he called out sick, after which he was not asked back to work at [the restaurant]. N.T. 2/4/2020 at p. 42.

[Father] testified that he took a parenting class called 24/7 Dads. N.T. 1/23/2020, p. 53. Caseworker Elizabeth Matthews who works as an intensive services specialist with Montgomery County [OCY], was assigned to work with birth mother in January of 2019, and to work with [Father] in August of 2019. When she began working with [Father], one of the priorities was to assist him in identifying a home where he could have [Child] come to live with him and be reunited.

There has been confusion between [Father], his relatives and OCY about whether the home where he was living with his father and his father's fiancée [in Telford] could be considered as an appropriate residence for [Father] and [Child] to be reunited. The apartment where he lives with his father and father's fiancée is a two-bedroom apartment; if [Child] were to move into that apartment, [Father] has proposed that he would sleep in the living room so that his daughter could have a bedroom.

Trial Court Opinion, 6/15/20, at 4-7.

The trial court found the following facts from the testimony of Elizabeth

Matthews, an OCY senior caseworker and intensive services specialist:

Ms. Matthews testified that [Father] discussed with her several different plans for his housing, including: moving in with a roommate; moving in with a girlfriend; moving to a larger place[,] with his father and father's fiancée, that would have a separate bedroom for each of [Child and Father]; or that he would stay in an apartment in Telford with two bedrooms[,] and his father and father's fiancée would move out. Over the months between August 2019 and February 2020, none of these plans came to fruition.

Ms. Matthews went to the apartment in Telford where [Father] lives with his father and his father's fiancée on two occasions in November 2019, on November 4, and November 11, to obtain random drug samples from [Father]. She was able to see part of the residence[,] but was not welcomed by the [] father and his fiancée[,] and was not permitted to see the master bedroom. She asked [Father] if she could walk through the home

with him and talk to him about child-proofing the residence. However, the grandfather and [Father] discussed it and advised her that she would not be able to view the whole apartment at that time. She was shown the [Father's] bedroom and bathroom. The bedroom was dark and had no lamp. She also saw the living room and kitchen. On her second visit, she was also made to feel unwelcome by the [] father's fiancée and was again not permitted to see the master bedroom.

As a result of these two unsuccessful visits to the home where [Father was] living, OCY was unable to complete an evaluation to determine whether the apartment would be safe and adequate to meet the needs of [Child and Father], should they be reunited.

Trial Court Opinion, 6/15/20, at 4-8.

The trial court found the following facts from the testimony of OCY caseworker Amber McCarthy.

Caseworker Amber McCarthy testified that [Father's] goals per his family service plans include maintaining his sobriety, attending treatment, stable housing, stable income, cooperating with parole, completing psychological and psychiatric evaluations, complying with recommendations, and completing a parenting class. N.T. 1/23/2020, p. 9. Because [Father] had an arrest for DUI in August, and tested positive for use of alcohol in November 2019, the OCY caseworker assessed his compliance with his goal of maintaining his sobriety as "minimal". *Id.* p. 10. [Father] completed a parenting class and he did complete psychological and psychiatric evaluations, although there was some difficulty in providing copies of these completed evaluations to OCY, as was required. He also attends drug and alcohol treatment at Penn Foundation. Although he completed a parenting class, the caseworker expressed concern regarding his ability to apply the skills that he has learned when parenting. *Id.* Although he completed psychological and psychiatric evaluations at Penn Foundation, OCY did not receive copies of these complete documents, including any recommendations. *Id.* at p. 11. Ms. McCarthy testified that [Father] declined to provide copies to her and stated that the evaluations were "confidential". *Id.*

- 7 -

Ms. McCarthy also recounted experiences of not being permitted to enter the home where the [Father] has been residing[,] and described paternal grandfather as not being cooperative and as cursing at OCY caseworkers. N.T. 1/23/2020, pp. 12-13. For example, a family support worker came to the door to get a random urine screen from [Father], and paternal grandfather said the following to the worker: "I work all fucking day. Get your shit together. You were here two fucking weeks ago." On another occasion Ms. McCarthy went to the home, unannounced. [Father] had just left. Paternal grandfather called him to return to the home. Ms. McCarthy asked if she could wait inside and paternal grandfather declined to allow her to wait in the apartment. *Id.*

Thus, OCY has had concerns that the household members with whom [Father] lives[,] his father and his father's fiancée, have been uncooperative and have not made the home available to be inspected by and evaluated by OCY as a residence where OCY could consider reunifying [Child] with [Father]. In addition, the home has only two bedrooms and[,] if [Child] were to reside there, there would be a question about [Father] indefinitely sleeping in the living room. While by itself this is not a reason for the home not to be approved, it has added to the confusion. [Father] has proposed many different options - living with a girlfriend, living with a friend, finding his own apartment, keeping the apartment and his father moving out. However, [Father] has never settled on a realistic plan and never presented a timeline for achieving a stable housing plan that could provide adequate space and privacy for [Child]. [Father], [paternal] father and his [father's] fiancée have also never made explicit that they wished to have OCY evaluate the current home to determine whether it could be made safe and appropriate as a residence for [Child]. To the contrary, paternal grandfather and his fiancée have repeatedly communicated to OCY staff that they have no intention or desire to cooperate with OCY. As a result of these concerns, OCY has concluded that [Father] has not proposed a stable and workable housing plan and identified an apartment or home that OCY could evaluate as a safe and appropriate place for [Child]. During the proceedings, [Father's] family members expressed confusion about why they had not been considered as family resources with whom [Child] might be placed while [Father] worked toward reunification. OCY caseworkers testified that[,] although they received communications from some of [Father's] relatives, including an aunt, expressing that they wished to be supportive to

[Father], none of them expressly offered a home for [Child]. By January 2020, [Father] had a schedule of four hours of visits per week with [Child], consisting of two-hour visits on two days. Birth mother had a similar but separate schedule, thus requiring [Child] to attend four 2-hour visits each week. [Father] attends the visits with [Child] and[,] while at first he required some coaching on what to bring (e.g. a change of clothing, supplies, a stroller, appropriate snacks, etc.)[,] the caseworkers testified that he has made progress on [bringing] appropriate clothing and food and supplies to visits. Ms. McCarthy describes the visits as primarily "play sessions." She described the visits as having "no boundaries" and "no structure." N.T. 1/23/2020 p. 16. She has emphasized to [Father] the need to do everyday things with [Child], such as going to a grocery store, but even when he went to a grocery store, he did not use the time to complete grocery shopping, but rather walked around the grocery store with [Child]. N.T. 1/23/2020 at p. 16. Ms. McCarthy also stated that "there is just not a lot of structure in regards to discipline. He will say no, but often he will laugh when he says no. He's not stern with her." N.T.1/23/2020 p. 17. Ms. McCarthy also testified that sometimes the beginning of a visit has been hard, and [Child] has cried when brought to see her [Father]. [Ms. McCarthy] also testified that he shows [Child] affection but that she has not seen [Child] show him affection. N.T. 1/23/2020 at p. 17-18.

Trial Court Opinion, 6/15/20, at 8-11.

The trial court found the following from the testimony of Ms. Matthews:

Caseworker Elizabeth Matthews testified that she attempted to work with [Father] on issues including finding stable and suitable housing, maintaining his sobriety, maintaining stable employment and budgeting. Ms. Matthews testified that she urged [Father] several times to work with her to complete a budget, and that it "was really hard to get an updated budget." N.T. 2/4/2020, p. 89. When she was able to review a budget with him, his expenses exceeded his income. Preparing a budget for [Father] was complicated by the fact that his work is seasonal, the hours and pay being inconsistent, and also by the fact that currently the apartment, utilities and groceries in the home where he lives are primarily paid for by his father and his father's fiancée. In addition, Ms. Matthews testified that she would ask for documentation from [Father] or ask him to work to make progress on items of concern and he would not make progress and not

respond to her requests. *Id.* at pp. 90-92. Ms. Matthews also testified, "I'm just concerned with overall the lack of follow-through that I saw in working with [Father]. You know, he was agreeable to the things that we have talked about, but he didn't really follow through with a lot of the things and didn't really make progress. As far as obtaining a [DUI] that wasn't a good choice." N.T. 2/4/2020 p. 138. In addition, Ms. Matthews expressed concern that [Father] was not candid with OCY about his DUI arrest. OCY found out about his arrest as a result of a docket search a couple of months after the fact, not because [Father] advised his caseworker.

Ms. Mathews testified that at visits with [Child, Father] struggled with setting boundaries, and had some trouble initially thinking through how to prepare a meal and have her sit down, have a meal with a variety of foods, and eat from her own plate, rather than asking for snacks or eating off of his plate. *Id.* pp. 93-94. For example, Ms. Matthews testified about a visit shortly before the hearing: [Father] tried to put a bib on [Child] at least three times, and she didn't want the bib on, so she just kept pulling it off so [Father] just gave up. And in the end, he ended up [feeding] her like a baby. So, she didn't eat much at that visit. She didn't want to be fed like a baby. She wanted to feed herself. So what ended up happening [is] she got chips instead of eating a meal.

Ms. Matthews also testified that [Child] struggles at the beginning of visits with [Father], becomes very reserved, "will cover her face with her hands," and will reach for the foster mother. *Id.* Ms. Matthews described [Child] as being "uncomfortable" being left alone with [Father]. *Id.*, p. 95. In addition, Ms. Matthews described that [Child] had become increasingly resistant to visits with [Father], "whining and crying in the car, needing coaxing from the worker or the foster parent to go with [Father], and then when it's time to leave, she doesn't cry for him." N.T. 2/4/2020, p. 100.

Summarizing her concerns about whether [Father] is currently capable of being a full[-]time caregiver for [Child], Ms. Matthews testified as follows:

> I'm concerned because he's currently unemployed. I'm concerned about the housing situation. I don't believe that the family is on board with [Child] living there. I'm

concerned about [Father's] risk of relapse. I'm concerned about what the child-care plan would be for [Child] if he were to become employed. I'm concerned about his outstanding criminal charges if he is at risk for going back to jail. . . .

I have concerns, because right now [Father] is not really even taking care of himself. I don't know that [Father] has independently cared for himself. So I don't know how he could care for a child. I have talked to [Father] about, for example, doing things like taking [Child] to the store to get paper products or groceries to exhibit, you know, a real life situation that he would do it he had her with him. And he has said, I don't do that. My dad and his girlfriend [do] that. So I feel as though he's in a situation where he is a child in their home. So I have a concern that he's not functioning as an independent adult would function.

N.T. 2/4/2020 at p. 96-100.

. . .

Although [Father] was in prison and missed out on an opportunity to parent his child for her first year and a half, it must be acknowledged that he has made significant strides since his release from prison in May of 2019: he has, with the support of his family, maintained a stable residence with his father, although not independently, and he has begun to maintain employment. Although his employment is seasonal and his hours were inconsistent, he has attempted to seek additional employment. He has had relapses with alcohol and a DUI, which understandably concern OCY, particularly as his violation of his parole and new criminal charge could result in him being incarcerated or could be associated with a likelihood of relapse. He has, however, been consistent in attending visits with his daughter. His attorneys effectively advocated that [Father] is making positive strides, and advocated on his behalf for increased visits with his daughter and for more time for him to establish himself and establish his relationship with his daughter.

While there has been some significant positive progress made by [Father] personally, there remain significant gaps and concerns about his ability to provide a safe, stable and loving home for himself and his daughter. With regard to whether OCY

could consider the home in which [Father] has been residing with his father and his father's fiancée as a home in which [Child] could be reunified with [Father], Ms. Matthews explained that the family members had been belligerent with OCY, that this had been raised with [Father], and that he had been told that his family members did not seem to be on board with a plan to reunify him with [Child] in that apartment, which would also require them to cooperate with OCY and permit home visits. Ms. Matthews testified that "[Father] never came back and said, 'you know, I talked to them, they want to reassess this'." N.T. 2/4/2020 p. 112.

Trial Court Opinion, 6/15/20, at 13-14.

The trial court then summarized the testimony of the two psychological experts, OCY's expert, Stephen Miksic, Ph.D., and Father's expert, Donald Seraydarian, Ph.D., who conducted psychological evaluations of Father, including addressing his capacity to parent. The trial court found the following from Dr. Miksic's testimony:

Stephen Miksic, Ph[.]D.[,] testified at the request of OCY. Dr. Miksic expressed a concern that[,] when asked about treatment for his history of drug and alcohol addiction, [Father's] "attitude toward treatment has always been that he doesn't really need it, that it has not been helpful for him, that he doesn't have any problems. . . . These are indications of either misrepresentation of a lack of ability to respond emotionally to the types of consequences and experiences that most people show when encountering these types of environmental conditions." N.T. 2/24/2020, pp. 12-13. When asked how he would respond to the challenges of being a parent, he told Dr. Miksic that "he really wouldn't be challenged; it would be very easy for him to take on this role without any prior experience in his current circumstances." N.T. 2/24/2020, p. 17. Similarly, Dr. Miksic testified that [Father] minimized the difficulty of maintaining sobriety and did not disclose to Dr. Miksic his arrest for DUI, until Dr. Miksic advised that he knew about it. *Id.* at p. 18. Dr. Miksic testified that he diagnosed [Father] as having anti-social personality disorder, and that diagnosis of alcohol dependency disorder would also be appropriate. Dr. Miksic testified that [Father] would "enhance the positive aspects of his functioning

and minimize, deny or misrepresent negative information." N.T. 2/24/2020, p. 69. This concerned Dr. Miksic because, as he stated, "openness and honesty is one of the basic foundation elements of recovery." *Id.* Dr. Miksic also expressed concerns that [Father] did not accept any responsibility for having not been available as a parent to [Child] during the first one and a half [years] of her life, while he was incarcerated.

Dr. Miksic described his observations of [Father's] interactions with [Child] as follows:

He attempted to meet her needs. He showed her appropriate affection. He was attentive to her so she wouldn't get hurt or fall down. [Child's] responses to her father were to enjoy playfulness together with him. However, she did not offer spontaneously to go to him for hugs, affection, for security if she was feeling insecure. She separated easily without crying or tearfulness at the end of the visiting sessions.

N.T. 2/24/2020, p. 21.

Trial Court Opinion, 6/15/20, at 14-15.

The trial court found the following from the testimony of Dr. Seraydarian:

Donald Seraydarian, Ph[.]D., testified at the request of [Father], stating that he had performed an extensive and comprehensive psychological evaluation of [Father]. Dr. Seraydarian testified that it is not unusual for a person, such as [Father], undergoing a parenting evaluation or similar evaluation, to engage in minimization and denial. Dr. Seraydarian also expressed his opinion that the goals articulated by the OCY caseworker were "vague and somewhat inconsistent." N.T. 2/24/2020, p. 103. Dr. Seraydarian emphasized that [Father] has been compliant with the terms of his parole (apart from his arrest for [DUI]) and has been compliant with drug and alcohol testing and with his treatment. He testified that [Father's] adjustment in the community following his release from prison has been "very positive, considering the depth of his addiction. I feel he's done very well." N.T. 2/24/2020, p. 108. However, Dr. Seraydarian also testified that "[i]n a lot of ways his coping mechanisms would

- 13 -

be typical of a boy who is twelve or thirteen. I found him to be immature, kind of naïve in a lot of ways." N.T. 2/24/2020, p. 109-110.

Dr. Seraydarian testified that [Father] will need a great deal more time, support and maturation before he is ready to be a parent to [Child] He also testified that he would like to see at least a year of sobriety in order to have confidence in [Father] as a full-time caretaker for a child. At the time of the hearing, [Father] had had relapses including a DUI in August 2019, and two episodes of testing positive for alcohol in or around November 2019. He had maintained his sobriety for two periods of only approximately three to four months. Dr. Seraydarian testified:

He's going to need a great deal of mentoring and support to really know what it means to be a parent. . . It will be important that he take a much more realistic approach. There's going to be lots of obstacles. There's lots of difficulties. And he seems to approach that in kind of an immature way. It's all going to be very smooth for him to make a real appreciation of what's needed and what's in the best interest of his daughter is - my impression is he would need a much more collaborative relationship with the foster parents as well as the caseworker.

N.T. 2/24/2020, pp. 110-111.

Asked whether he could conclude, based upon his evaluation, that [Father] would be able to successfully parent his child within a reasonable period of time, Dr. Seraydarian demurred, stating, "I think it is possible. I don't feel that I have enough data to reach that definitive conclusion." N.T. 2/24/2020, p. 111-112.

Trial Court Opinion, 6/15/20, at 15-17.

On June 17, 2020, the trial court entered the decree involuntarily terminating Father's parental rights to Child. On July 10, 2020, Father filed a notice of appeal, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In his brief on appeal, Father raises four issues:

- 14 -

1. [Whether the] Superior Court must *sua sponte* remand the matter because, among other reasons as set forth in this brief, the legal position of the child and the best interest position of the child, if any, were not made known to the [t]rial [c]ourt[?]

2. Whether the trial court committed an error of law and abused its discretion by improperly shifting the burden of proof to Appellant Father to disprove that grounds for termination existed and by not requiring the [Agency] to prove its case by clear and convincing evidence?

3. Whether the trial court committed an error of law and abused its discretion when it terminated [F]ather's parental rights pursuant to 23 Pa.C.S. [§] 2511(a)(2)?

4. Whether the trial court committed an error of law and abused its discretion when it terminated [F]ather's parental rights pursuant to 23 Pa.C.S. [§] 2511(a)(8) when the child was not removed from the care of [F]ather and the conditions which led to removal no longer exist?

Father's Brief, at 1-2.

First, we address whether we must *sua sponte* remand the matter, as Father asserts. On October 10, 2020, the trial court appointed Child's guardian *ad litem* ("GAL"), Attorney Mary Coyne Pugh, to serve a dual role as GAL and legal interests counsel ("GAL/Counsel") for Child. **In re: Adoption of L.B.M.**, 639 Pa. 428, 161 A.3d 172 (2017). While Father has raised the quality of GAL/Counsel's representation of Child in his brief, he failed to preserve it in his concise statement and, thus, waived it. **See Krebs v. United Refining Company of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006). Even if Father had not waived the issue, we would not remand the matter *sua sponte*. Child was two years old at the time of the hearings, and so her preferred outcome could not be ascertained at that time. **In re: T.S.**,

- 15 -

648 Pa. 236, 192 A.3d 1080 (2018) (holding the trial court did not err in allowing the children's GAL to act as their sole legal representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome). We do not rule on the quality of the GAL/Counsel's representation of Child. ***See In re: Adoption of K.M.G.***, 219 A.3d 662, 669 (Pa. Super. 2019) (*en banc*) (holding that this Court has authority only to raise *sua sponte* the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation) (*affirmed*, ___ Pa. ___, 240 A.3d 1218 (2020)). However, we note that it is apparent from our review of the record, including the notes of testimony from the hearings, that Attorney Pugh provided a zealous and vigorous representation of Child, presenting the foster mother as a witness for Child, conducting cross-examination of the witnesses, and advocating for Child's best interests, also filing a brief on appeal. We would find this issue has no merit.

We thus proceed to consider Father's remaining issues. First, we address Father's contention that the trial court committed an error of law and abused its discretion when it terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2).

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a

- 16 -

petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

*In re: Adoption of S.P.*, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re: R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (*quoting **In re: J.L.C.**,* 837 A.2d 1247, 1251 (Pa. Super. 2003)).

Section 2511 requires a bifurcated analysis. *See* 23 Pa.C.S. § 2511. We have stated:

> [i]nitially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re: L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the court as to any one subsection of Section 2511(a), in addition to Section 2511(b), to affirm. *In re: B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, the trial court terminated Father's parental rights under Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> \* \* \*

- 18 -

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b). Further, we have explained:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re: Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation

omitted). We have instructed,

[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties.

*In re: A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

- 19 -

In its Pa.R.A.P. 1925(a) opinion, the trial court stated:

. . . [Father] argues that, although this [c]ourt found an incapacity to parent, there was no express finding that "the conditions and causes of the incapacity cannot or will not be remedied by the parent." Although this exact phrase was not set forth in the June 15, 2020 opinion vis-a-vis Section 2511(a)(2), the [c]ourt did say, at page 19:

> Where a child has been in foster care for over 20 months at the time of these hearings, and over two years now, the possibility that [Father] may continue to mature, may be able to maintain his sobriety and may someday be ready to be a parent, is too remote and uncertain for this court to require the child to wait longer for permanency.

If this is not sufficiently clear, this [c]ourt now clarifies that the evidence presented in the case established that [Father] does not now have the capacity to parent, the gaps in his maturity, his complete lack of appreciation of the challenges of parenting, and his failure to take responsibility for his absence from his child's life, all demonstrate that he is either unwilling to or unable to remedy this incapacity. Neither of the two experts expressed an opinion that [Father] is now capable of parenting. Both agreed that [Father] has numerous obstacles to overcome, including his immaturity and maintaining his sobriety.

Even Donald Seraydarian, [Ph.D.,] [Father's] own psychological expert, testified that [Father] needed to achieve greater maturity and to demonstrate sobriety for at least a year. Although Dr. Seraydarian opined that it is possible that [Father] might at some point overcome all of these obstacles, he acknowledged that the likelihood of [Father] overcoming his incapacity to parent was uncertain and he would continue to require a great deal of support to maintain his sobriety and to gain the maturity needed to become a successful parent. Because the testimony was consistent that [Father] did not recognize his own challenges, his need for treatment, or his need for significant support, this [c]ourt has no hesitation in concluding that [Father] cannot or will not remedy the causes of his parental incapacity.

Trial Court Supplemental Opinion, 8/14/20, at 4-5.

The trial court considered Father's inability to parent Child because he could not maintain sobriety; his inability to obtain stable and safe housing for Child; Father's failure to obtain meaningful employment; Father's failure to engage in mental health recommendations; Father's failure to live without having periods of incarceration; and Father's failure to put Child's needs ahead of his own needs. The trial court found that these conditions continue to exist, and that Father will not remedy them within a reasonable period of time. We conclude that the competent evidence in the record supports the trial court's credibility and weight determinations. Thus, we will not disturb the trial court's determination regarding Section 2511(a)(2). *In re: Adoption of S.P.*, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012).

Next, the trial court considered Father's argument that the court erred and abused its discretion in terminating Father's parental rights pursuant to 23 Pa. C.S. § 2511(a)(8), since Child was not removed from the care of Father, and the conditions which led to removal no longer exist. As we agree with the trial court that OCY successfully established that Father's parental interests should be terminated pursuant to Section 2511(a)(2) we need not examine this issue. *In re: B.L.W.*, 843 A.2d at 384.

Additionally, with regard to Father's contention that the trial court improperly shifted the burden to Father to disprove that grounds for termination existed, rather than requiring OCY to prove its case by clear and convincing evidence, the trial court stated:

[Father] . . . asserts that this [c]ourt impermissibly shifted the burden of proof to [Father] to "disprove" the claims of incapacity to parent asserted by [OCY]. This is incorrect. This [c]ourt evaluated the testimony and evidence produced by [OCY] in its case in chief and relied primarily on this testimony and evidence in reaching its conclusion that [OCY] met its burden, by clear and convincing evidence, on this issue. To be sure, this [c]ourt seriously considered and weighed the evidence presented by [Father] and his witnesses in opposition to [OCY]'s assertions, but did not shift the burden of proof to [Father]. This [c]ourt discussed at length in its initial opinion[] the evidence presented by [OCY], which supports the [c]ourt's conclusion that [Father] is incapable of parenting and cannot or will not remedy the incapacity. The evidence presented by [OCY] included but was not limited to a showing that [Father's] visits with [Child] were in essence "play sessions" with "no structure"; that [Father] was unable to follow through on simple tasks such as making a budget; that [Father] repeatedly changed his stated plans regarding his housing and executed none of these plans; and that [Father], after his release from prison and knowing that maintaining his sobriety was a goal on his Family Service Plan, was arrested for driving under the influence in August of 2019 and tested positive for using alcohol in November of 2019. [OCY]'s psychological expert, Stephen Miksic, [Ph.D.,] testified that [Father's] "attitude toward treatment has always been that he doesn't really need it." (N.T. 2/24/20, 12-13.) The expert testified that [Father] minimized the challenges of being a parent, and that [Father] minimized the difficulty of maintaining sobriety and did not disclose to Dr. Miksic his arrest on a [DUI] charge until the doctor advised that he knew about it. (N.T. 2/24/20, 17, 18.) Thus [OCY] presented clear and compelling evidence of [Father's] incapacity to parent, as well as his inability to recognize his continued need for treatment to sustain his recovery from substance abuse and his minimization of the challenges he would face as a full-time parent. This evidence demonstrated not only [Father's] current incapacity to parent but also his lack of the tools, understanding and realism to overcome this incapacity.

Trial Court Supplemental Opinion, 8/14/20, at 2-3.

We adopt the trial court's analysis as this Court's own, and find no merit

in Father's contention that the trial court erred or abused its discretion.

- 22 -

Finally, considering the bifurcated analysis, we find Father waived a challenge to Section 2511(b) by his failure to challenge that section in his concise statement and statement of questions involved portion of his brief on appeal, and his failure to develop it in the argument section of his brief. **See In re: M.Z.T.M.W.**, 163 A.3d 462, 465-466, n. 3 (Pa. Super. 2017).

Even if Father had not waived the challenge to Section 2511(b), we would find it lacked merit. This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but it is on the child pursuant to Section 2511(b). **See In re: Adoption of C.L.G.**, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M.**, [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791.

**In re: T.S.M.**, 620 Pa. 602, 628-629, 71 A.3d 251, 267 (2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as

well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re: Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re: K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008) (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). In *In re: K.Z.S.*, we explained that in cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. *Id.* at 763. "The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *Id.* We instructed that the court should also consider the intangibles, such as the love, comfort, security, and stability the child might have with a foster parent. *Id.* Thus, the court may emphasize the safety needs of the child. *Id.*

"[A] parent's basic constitutional right to the custody and rearing of . . . [his] child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re: B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). "Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re: Adoption of J.M.*, 991 A.2d

321, 324 (Pa. Super. 2010) (quoting *In re K.Z.S.*, 946 A.2d at 763). "If a parent fails to cooperate or appears incapable of benefiting from the reasonable efforts supplied over a realistic period of time, [the Agency] has fulfilled its mandate and upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted." *In re: A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003) (citation omitted). This Court has held that a parent's love of his child, alone, does not preclude a termination. *See In re: L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007).

Regarding Section 2511(b), the trial court stated:

Section (b) of the statute requires the [c]ourt to give primary consideration to the developmental, physical and emotional needs and welfare of the child. The Superior Court, interpreting the Adoption Act, has held that "the health and safety of the child supersede all other considerations." In considering the child's needs and welfare, a court must consider the role of the parental bond in the child's life. I am required by prior case decisions to fully consider whether a parental bond exists to such an extent that severing this natural relationship would be contrary to the needs and welfare of the child.

In this case, the testimony clearly established that, although the [Father] has, since May 2019, maintained contact and sought opportunities to develop a parental relationship with [Child], there is no parental bond between [Father] and [Child]. Although [Father] expresses love and affection for [Child], there is not a healthy, secure parent-child bond with [Child].

In this case, [Father] has not provided a home, has not met [Child's] needs, has not consistently provided for [Child] financially, and has not developed and maintained a secure parent-child attachment. The parent's desire to start over at this time is insufficient to meet [Child's] ongoing, day in and day out needs for consistent and reliable love, affection and responsibility. By contrast [Child] has developed a bond with her foster mother

which has been described in testimony as a "safe attachment". N.T. 2/4/2020 at p. 18.

I conclude that the emotional needs and welfare of the child can best be met by termination of the parental rights of [Father], and that the child will not suffer a detriment as a result of termination of the parental rights of [Father]. In addition, based upon the evidence presented, I find that [Child] has developed a secure bond with the prospective adoptive parents and that termination of parental rights so that [Child] may be adopted and achieve permanency will best serve the emotional and developmental needs and welfare of the child.

Trial Court Supplemental Opinion, 6/15/20, at 21-22.

We find that the trial court's conclusion, that Father did not meet the emotional needs and welfare of Child and that she has no bond with Father that would be harmed by termination of his rights, is supported by competent evidence in the record. Thus, we would find no error or abuse of discretion in the trial court's determination that OCY met the requirements pursuant to Section 2511(b). Accordingly, we affirm the trial court decree.

Decree affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/23/2021